The AUSTAD COMPANY, a South Dakota corporation, Appellant,

v.

PENNIE & EDMONDS, a New York partnership, Appellee.

No. 86–5306.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1987.

Decided July 9, 1987.

William C. Garry, Sioux Falls, S.D., for appellant.

Lon J. Kouri, Sioux Falls, S.D., for appellee.

Before McMILLIAN and WOLLMAN, Circuit Judges, and WRIGHT,* Chief District Judge.

McMILLIAN, Circuit Judge.

The Austad Company (Austad), a South Dakota corporation, appeals from a final judgment entered in the District Court [1] for the District of South Dakota dismissing its complaint against Pennie & Edmonds, a New York partnership, for lack of personal jurisdiction. For reversal Austad argues that the district court had jurisdiction over Pennie & Edmonds under the South Dakota long-arm statute. S.D. Codified Laws Ann. 15–7–2 (1984). For the reasons discussed below, we affirm the order of the district court.

Pennie & Edmonds, a law firm, specializes in patent litigation. Its principal offices are located in New York, New York. Pennie & Edmonds is not, and never has been, licensed to practice law in the state of South Dakota, nor does Pennie & Edmonds maintain any business interests or bank accounts in South Dakota. Pennie & Edmonds has never advertised its services in South Dakota or solicited clients there, but the firm is listed in the Martindale-Hubbell Law Directory.

Austad is engaged in the business of selling and distributing sporting goods. Its sole office and only place of business is in Sioux Falls, South Dakota. In 1984 Austad received written notice from Anthony Antonious alleging that Austad's sale of certain types of golf gloves infringed a patent held by Antonious. Antonious sent similar notices to several other golf glove distributors. Richard Goldstein, president of Dorson Sports, a New York corporation, retained Pennie & Edmonds as counsel to seek a declaratory judgment invalidating the patent. Goldstein solicited other golf glove distributors, including Austad, to share in the costs of the patent litigation.

On May 10, 1984, a meeting was held in the New York offices of Pennie & Edmonds to discuss the pending lawsuit. Present at the meeting were Goldstein as well as representatives of other golf glove distributors. Austad was not present at this meeting, but Goldstein informed Pennie & Edmonds that he had authority to represent Austad. During the course of the meeting, Pennie & Edmonds indicated that there was an 80 percent probability that the Antonious patent would be declared invalid in the declaratory judgment action. The cost to conduct the suit to judgment was estimated at $250,000. It was agreed that each of the distributors, including Austad, would contribute an equal one-sixth share of the cost of the litigation.

Pennie & Edmonds then commenced the suit for declaratory judgment on behalf of Austad and the other five distributors in federal district court in Maryland. Antonious answered and counterclaimed against the four named plaintiffs, and initiated separate proceedings against two unnamed plaintiffs,[2] alleging patent infringement, antitrust violations, tortious interference with contract, and unfair competition. The

---

* The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. The unnamed plaintiffs in the declaratory judgment action were Ramata Ri, a Japanese manufacturer and distributor of golf gloves, and Yie & Co., a representative of Korean manufacturers of sports gloves. Although Kamata Ri and Yie & Co. agreed to share in the costs of the declaratory judgment action, they were not named as plaintiffs because of the belief that their direct involvement as named parties would greatly increase the cost of the litigation.

district court consolidated the cases for discovery and trial.

During the discovery stage of the proceedings, Pennie & Edmonds sent an associate and a law clerk to Austad's facilities in South Dakota to review and copy documents and gather information needed to answer interrogatories. The visit took place from October 24 to October 26, 1984.

Before the scheduled date for trial, Pennie & Edmonds prepared two estimates of trial costs based on a "minimum effort" and an "all out" effort. Fees and expenses incurred before these estimates were $637,-000. When the projected fees and expenses were added to this amount, Austad claims that the total share of litigation expenses it owed would have totaled five times the original estimate. Faced with these increased costs, Austad informed Pennie & Edmonds that it no longer desired the law firm to represent it in the litigation. Austad then settled with Antonious for an amount it asserts is less than what it had already paid to Pennie & Edmonds in legal fees.

Austad had incurred $39,808.94 in unpaid legal expenses at the time it withdrew from the litigation in January 1986. When Pennie & Edwards sought payment, Austad refused and instead filed this action in federal district court in South Dakota alleging breach of fiduciary duty and professional negligence in connection with Pennie & Edmonds' representation of Austad in the Maryland patent litigation. Austad seeks damages in the exact amount it owes Pennie & Edmonds.

Pennie & Edmonds moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, or in the alternative, to transfer the case to the district court in New York under 28 U.S.C. § 1404(a). The district court granted the motion to dismiss on the ground that the district court lacked personal jurisdiction over Pennie & Edmonds under the South Dakota long-arm statute and under the authority of *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–95, 100 S.Ct. 559, 564–66, 62 L.Ed.2d 490 (1980). Austad now appeals.

The sole issue presented in this appeal is whether the district court erred in dismissing Austad's action for lack of personal jurisdiction.

■ A two-pronged analysis is used in determining issues of personal jurisdiction. A court must first determine whether the forum state's long-arm statute confers jurisdiction over the non-resident defendant. *Sales Service Inc. v. Daewoo Int'l (America) Corp.*, 719 F.2d 971, 972 (8th Cir.1983). Assuming the requirements of the forum state's long-arm statute have been satisfied, the court must next determine whether the exercise of personal jurisdiction over the non-resident defendant comports with due process. *See, e.g., Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309, 312 (8th Cir.1982).

Austad contends the district court had jurisdiction over Pennie & Edmonds under both the tort accrual[3] and catch-all[4] provisions of South Dakota's long-arm statute. The South Dakota Supreme Court has interpreted the long-arm statute to confer jurisdiction "to the fullest extent permissible under the due process clause of the Fourteenth Amendment." *Ventling v. Kraft*, 83 S.D. 465, 161 N.W.2d 29, 30 (1968). *See, Plucker v. Plucker*, 338 N.W.2d 842, 843 (S.D.1983) (provisions of South Dakota long-arm statute comport with due process requirements if non-resident defendant has minimum contacts with this state).

**3.** S.D. Codified Laws Ann. § 15–7–2(2) (1984) confers jurisdiction over any person involved in the "commission of any act which results in accrual within this state of a tort action."

**4.** S.D.Codified Laws Ann. § 15–7–2(14) (1984) confers jurisdiction over any person involved in the "commission of any act, the basis of which is inconsistent with the Constitution of this State or with the Constitution of the United States."

The long-arm statute was amended in 1986 to include subdivision (14). The alleged acts giving rise to this lawsuit occurred before subdivision (14) was added. The South Dakota Supreme Court has held, however, that newly enacted subdivisions of the long-arm statute are to be applied retroactively. *Plucker v. Plucker*, 338 N.W.2d 842 (S.D.1983); *Johnson v. Kusel*, 298 N.W.2d 91 (S.D.1980).

In order to constitutionally assert personal jurisdiction over a non-resident defendant, " 'traditional notions of fair play and substantial justice' " must not be offended. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), *citing Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940). The defendant must "purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). In addition, a defendant must have "fair warning that a particular activity may subject [him or her] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J. concurring).

The United States Supreme Court has noted more recently that there must be a " 'substantial connection' " between the defendant and the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citation omitted). At least four Justices on the Court have adopted the position that the requisite " 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.*" *Asahi Metal Industry Co. v. Superior Court,* ── U.S. ──, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (emphasis in original).

■ This court in *Land O–Nod Co. v. Bassett Furniture Industries, Inc.,* 708 F.2d 1338, 1340 (8th Cir.1983), set forth a five factor test for measuring minimum contacts:

(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

The above test is not to be mechanically applied; rather, the facts and attendant circumstances of each case are to be considered. "[A]pplication of these factors does not provide a slide rule by which fundamental fairness can be ascertained with mathematical precision." *Toro Co. v. Ballas Liquidating Co.,* 572 F.2d 1267, 1270 (8th Cir.1978). For example, it has generally been held that the first three factors are of primary importance while the last two factors are of secondary importance. *See, e.g., Gardner Engineering Corp. v. Page Engineering Co.,* 484 F.2d 27, 31 (8th Cir. 1973).

■ Austad concedes that the three day visit to South Dakota by a Pennie & Edmonds associate and law clerk to review and inspect documents was the law firm's only physical contact with South Dakota. Other contacts asserted by Austad include numerous phone calls between New York and South Dakota, the use of courier services (at Austad's expense), monthly billings mailed to South Dakota, and checks paid by a South Dakota bank. These contacts, Austad contends, amounted to an ongoing attorney-client relationship between Austad and Pennie & Edmonds sufficient to warrant a finding of personal jurisdiction in this case.

While we do not dispute Austad's claim that an attorney-client relationship existed between Austad and Pennie & Edmonds, we do not believe that Pennie & Edmonds had sufficient contacts with South Dakota to confer personal jurisdiction. Pennie & Edmonds does not maintain an office in South Dakota nor do any of its attorneys reside there or maintain a license to practice law there. Pennie & Edmonds has never advertised or solicited business in South Dakota. Further, Pennie & Edmonds did not actively seek out Austad as a client. Rather, the representation of Austad by Pennie & Edmonds was arranged through Richard Goldstein, president of a New York corporation which was a regular client of the law firm. Finally, the actions giving rise to this lawsuit took place in Maryland, not in South Dakota. In short, Pennie & Edmonds' only "substan-

tial connection" with South Dakota was its representation of a South Dakota corporation in connection with litigation taking place wholly outside South Dakota. Based on these facts, we do not believe a showing has been made that Pennie & Edmonds purposefully availed itself of the benefits and protections of the laws of South Dakota. We therefore hold that Pennie & Edmonds did not have minimum contacts with South Dakota and thus was not subject to suit in South Dakota.

Accordingly, we affirm the order of the district court.